# In the United States Court of Federal Claims

No. 15-837C/15-844C (Bid Protest) (Consolidated)
(Filed Under Seal: December 4, 2015 | Reissued: December 14, 2014)[*]

|  |  |  |
|---|---|---|
| BRASETH TRUCKING, LLC, and CORWIN COMPANY, INC., | ) ) ) | Keywords: Bid Protest; Standing; Past Performance Evaluation; FAR 15.305(a)(2)(iv); Adjectival Ratings; Trade-off Analysis; FAR 15.308; Remand to Agency |

```
                                      )      Keywords: Bid Protest; Standing;
BRASETH TRUCKING, LLC, and            )      Past Performance Evaluation;
CORWIN COMPANY, INC.,                 )      FAR 15.305(a)(2)(iv); Adjectival
                                      )      Ratings; Trade-off Analysis; FAR
                  Plaintiffs,         )      15.308; Remand to Agency
                                      )
            v.                        )
                                      )
THE UNITED STATES,                    )
                                      )
                  Defendant.          )
                                      )
```

*Cynthia Malyszek*, Malyszek & Malyszek, Westlake Village, CA, for Plaintiffs.

*Emma E. Bond*, Trial Attorney, Commercial Litigation Branch, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Department of Justice, Washington, DC, for Defendant. *Elin M. Dugan*, Senior Counsel, U.S. Department of Agriculture, *Of Counsel*.

---

[*] This Opinion was originally issued under seal, and the parties were given the opportunity to request redactions. In light of the parties' suggested redactions (filed on December 11, 2015), the opinion is now reissued, with redactions of potentially sensitive proprietary information indicated by brackets. While certain pricing information has been redacted, the Court rejects Braseth's request for further redactions of certain performance evaluation information because such material is not within the protective order (ECF No. 8), which defines protected information as "information that must be protected to safeguard the competitive process." See also Miller-Holzwarth, Inc. v. United States, 44 Fed. Cl. 153, 154 (1999) (observing that "harm to reputation . . . does not constitute the type of 'compelling justification' that must be present to deny the public's access to judicial records") (citations omitted).

## OPINION AND ORDER

**KAPLAN, Judge.**

Before the Court are Plaintiffs' motion for judgment on the administrative record and Defendant's motion to dismiss and cross-motion for judgment on the administrative record. For the reasons set forth below, the Court **GRANTS** the government's motion to dismiss as to Corwin Company, Inc. ("Corwin") but **DENIES** that motion as to Braseth Trucking, LLC ("Braseth"). Further, because the Court finds that the stated rationales for the agency's decision in this matter appear to be internally inconsistent, it has concluded that further explanation and clarification by the agency is necessary to facilitate its review of Braseth's claims. Accordingly, the Court **REMANDS** this matter to the agency and **STAYS** the cross-motions for judgment on the administrative record pending the agency's remand decision.

## BACKGROUND

### I.   The United States Forest Service and its Fire-Fighting Responsibilities

Founded in 1905, the United States Forest Service (USFS) manages and administers roughly 188 million acres of public lands, mainly in the western states. See 36 C.F.R. § 200.3; About the Agency, U.S. Forest Service, http://www.fs.fed.us/about-agency. USFS has divided the lands it manages into nine geographic regions. See 36 C.F.R. § 200.2(a). Region 6, the Pacific Northwest Region, includes public lands in the states of Oregon and Washington. Id. § 200.2(e).

Wildfires are endemic to the public lands in the western states and USFS plays a key role in managing wildfires on the lands it administers. See Fire, U.S. Forest Service, http://www.fs.fed.us/managing-land/fire. To prepare for the inevitable fires in Region 6, USFS stocks caches of firefighting equipment across the region. See Administrative Record (AR) Tab 4 at 10 § C-1. USFS then contracts with local trucking outfits to transport this equipment to the locations where it is needed when a fire erupts. Id.; see also AR Tab 1 at 1 (file memo discussing the region's transportation needs). Region 6 has historically awarded these contracts on three-year contract cycles. AR Tab 1 at 1.

### II.   The Solicitation

On March 11, 2015, USFS issued a pre-solicitation notice regarding an upcoming solicitation for contractors to provide "Fire Cache Freight Services" in Region 6. AR Tab 3 at 3–5. These services would include "the delivery of emergency supplies and equipment by tractor-trailer for wild land fire suppression and all-hazard emergencies to various locations in the western United States." Id. at 3.

On March 30, USFS followed up with an official solicitation, numbered AG-04H1-S-15-0006. AR Tab 4 at 6–45. The method of solicitation was an "RFQ"—i.e., "Request for Quotations," id. at 6, and the government expected to award a "Firm-Fixed Price Multiple Award IDIQ contract" for the freight cache services, id. at 34 § I-13. The solicitation requested quotations for three cache locations: La Grande, OR; Redmond,

OR; and East Wenatchee, WA. Id. at 7–9. For the La Grande cache (which is at issue in this case), the solicitation indicated that the government intended to award up to three contracts. Id. at 7. The contractors would be required to "[h]ave [a] 24 hour per day, 7 day per week communication system in place to allow the Government to place oral orders" and to "[f]urnish tractor(s) or a tractor(s) with trailer(s) and dollies as required, with driver(s) . . . within 1-1/2 hours . . . after placement of [an] order by the Government." Id. at 11 § C-3. In addition, "the inside of the trailers shall be swept clean." Id.

According to the solicitation, the government would award a contract to "the responsible offeror whose offer conforming to the solicitation will be most advantageous to the Government, price and other factors considered." Id. at 45 § M. The "[b]asis of [the] [a]ward" would be a combination of price and two other factors: past performance and availability of tractor-trailers within 50 miles of the relevant equipment cache. Id. at 7, 45.

In terms of price, offerors were to provide quotations for two contract items: transportation services using the company's own tractor-trailers, and transportation services using "Government-owned Cache Vans." Id. at 7–9. For each of these items, offerors were to provide per-mile prices for three distance ranges in each of three years: the base year (July 1, 2015 through June 30, 2016) and two option years. Id. The distance ranges were "1 to 100 miles," "101 to 300 miles," and "301+ miles." Id.

The solicitation stated that the "[b]asis for determining low, second low, third low etcetera for ordering purposes" would be "the average cost per mile" for all three distance ranges over the three-year life of the contract "for [i]tem 01 for each location." Id. The solicitation provided the following example of this calculation:

### LA GRANDE INTERAGENCY FIRE CACHE

|  | BASE | Option 1 | Option 2 |  |
|---|---|---|---|---|
| 1 to 100 miles | $3.00 | $3.03 | $3.08 |  |
| 101 to 300 miles | $2.77 | $2.80 | $2.85 |  |
| 301 + miles | $2.00 | $2.04 | $2.08 |  |
|  | $7.77 | $7.87 | $8.01 | divided by 3 = $7.883 |

Id.

As for the non-price factors, past performance would be considered more important than availability. See id. at 45. Moreover, when assessing an offer as a whole, the non-price factors, when combined, would be considered "approximately equal to price" in importance. Id. at 7, 45.

In its description of the contract's specifications, the solicitation set forth a "Rotation Schedule" describing how orders would be placed among the successful offerors. Id. at 10 § C-2. The schedule divided the contract year into twenty periods of

seven to ten days.[1] Id. The solicitation explained that the government would "place orders on a rotation basis with the vendor having the lowest average mileage rate being scheduled first" on the schedule. If a vendor could not perform during its scheduled week, the order would be "placed with the next scheduled vendor." Id.

The solicitation incorporated by reference several provisions of the Federal Acquisition Regulations (FAR) and the Agriculture Acquisition Regulations (AGAR). See id. at 6, 19–37. Among these were FAR 52.212-1 ("Instructions to Offerors – Commercial Items"), FAR 52.212-4 ("Contract Terms and Conditions – Commercial Items"), and AGAR 452.216-73 ("Minimum and Maximum Contract Amounts"), which specifies that that government will not place orders "in excess of $150,000 per year" over the course of the contract. Id. at 32 § I-9. The solicitation was also "set aside 100% for small business." Id. at 6 § 10.

## III. Quotations and Awards

USFS considered five quotations received in response to the solicitation for freight cache services at the La Grande cache.[2] AR Tabs 5–9 at 46–58. These quotations came from two sets of related companies. The first set included A-Secured Properties, LLC ("A-Secured") and Smith Bros. Moving Services ("Smith Bros."). See AR Tab 5 at 46–48; AR Tab 9 at 55–58 (quotations from A-Secured and Smith Bros. providing the same contact information for both companies). The second set included Braseth, Corwin, and Connie's Inc. ("Connie's"). See AR Tab 6 at 49–50; AR Tab 7 at 51–52; AR Tab 8 at 53–54. The quotations from Braseth, Corwin, and Connie's simply listed their offered prices for items one and two. See AR Tabs 6–8 at 49–54. In addition to listing prices, the quotations from A-Secured and Smith Bros. each included a "past performance data sheet" describing each company's past work performance on government freight services contracts. See AR Tab 5 at 46–48; AR Tab 9 at 55–58. The companies offered the following average prices per mile over the life of the contract:

| Connie's | $[. . .] |
|----------|----------|
| Braseth | $[. . .] |
| Corwin | $[. . .] |
| A-Secured | $[. . .] |
| Smith Bros. | $[. . .] |

---

[1] The schedule covered only the period from July 1 through November 27, which apparently corresponds to the fire season in Region 6. See AR Tab 4 at 10–11 § C-2.

[2] USFS received a sixth quotation from another company, but declined to consider it because of its "excessive and unreasonable pricing proposal." Def.'s Mot. to Dismiss, Opp'n to Pls.' Mot. for J. Upon the Admin. R., and Cross-Mot. for J. Upon the Admin. R. (Def.'s Mot.) at 4, ECF No. 15 (quotations omitted). Accordingly, that quotation is not included in the administrative record.

AR Tab 12 at 72.[3]

After receiving the quotations, USFS convened a Technical Proposal Evaluation Committee (TPEC) in the first week of June 2015 to evaluate the quotations' non-price factors. AR Tab 12 at 68. The TPEC consisted of the cache manager for the La Grande cache, Cheryl Campbell, along with the cache manager for the Redmond cache and a forest fuels specialist from the region served by the Wenatchee cache. See id. The TPEC ranked proximity and past performance for each quotation using the following adjectival rating system: Exceptional (E), Good (G), Satisfactory (S), Marginal (M), and Unacceptable (U). Id. at 69. Notably, the TPEC found that "[t]he quality and completeness of the quote packages was marginal, at best." Id. But because the TPEC members "had prior experience with all the companies who submitted quotes," they "relied heavily on their respective knowledge of the companies." Id. The TPEC gave the Le Grande quotations the following ratings:

|  | Proximity | Past Performance |
|---|---|---|
| Connie's | E | S |
| Braseth | E | S |
| Corwin | E | S |
| A-Secured | E | E |
| Smith Bros. | E | E |

Id.[4]

After the TPEC assigned these ratings, it met with the CO to review the quotations. Id. In a June 16, 2015 Memorandum of Negotiation, the CO reported that the TPEC gave "satisfactory" past performance ratings to Connie's, Braseth, and Corwin because of "issues [in] the past two years dealing with untimely invoicing, late deliveries, and having to reject a truck since it arrived at the cache full of junk." Id. at 69–70. The CO noted that "although these are separate companies, all three are owned by the same person, utilize the same personnel, and use each other's[] trucks interchangeably," and agreed that "Connie's satisfactory rating was appropriate due to the recent performance concerns." Id. at 70. At the same time, though, he stated that Braseth and Corwin "lacked recent past performance with the agency," and that, under FAR 15.305(a)(2)(iv), "an

---

[3] The Court notes several apparent errors in a table found in the government's undated abstract of offers. AR Tab 10 at 62. These errors make Braseth's quotation appear to be slightly more expensive than Corwin's, and make Smith Bros.' appear more expensive than A-Secured's. See id. However, the table in the Government's negotiation memorandum (AR Tab 12 at 72) contains accurate numbers, and the Court will rely on those numbers throughout this opinion.

[4] The TPEC initially assigned Braseth, Connie's, and Corwin a "G" rating for proximity; but after reviewing the rationale for the ratings, the contracting officer raised them to "E" as all three were located within ten miles of the cache. See AR Tab 12 at 69.

offeror without a record of relevant past performance . . . may not be evaluated favorably or unfavorably on past performance." Id. Nonetheless, he left their satisfactory past performance ratings in place, because "it was considered a neutral rating." Id.

The CO then evaluated the quotations based on price. Id. at 70–75. For the La Grande cache, the variance between the high bid and the low bid was only [. . .] percent, which the CO described as "very tight." Id. at 74.

Finally, in consultation with the TPEC, the CO made award recommendations. Id. at 74–75. For the La Grande cache, he first noted that "[t]he three lowest priced quotes"—Braseth's, Corwin's, and Connie's—"were also the lowest rated technically." Id. at 74. "Keeping in mind the combination of past performance and proximity were considered of equal importance to price," the CO recommended awarding contracts to A-Secured, Smith Bros., and Connie's. A-Secured and Smith Bros., though higher priced, were considered "reliable providers" who had "consistently met their delivery schedules," and their prices were considered "competitive and reasonable." Id. The CO also determined that Connie's would be "suitable for award" because it was "lowest in price." Id. But because of its past performance issues, he noted that Connie's would "require additional monitoring and scrutiny during the performance of [the] contract." Id. at 75.

Braseth and Corwin were not recommended. Id. at 75. The CO reiterated that the TPEC expressed "the same concerns with Corwin as it did with Connie[']s" and had "identical concerns" for Braseth; but also stated that the companies were each "considered a new company without a recent record of past performance." Id. Moreover, the CO noted that Braseth's and Corwin's prices were higher than Connie's, but not substantially lower than Smith Bros.' or A-Secured's. See id. Accordingly, on June 16, 2015, the CO "determined to make award" to the three recommended companies: A-Secured, Smith Bros., and Connie's. Id.; see also AR Tab 13 at 76–109 (IDIQ Award No. AG-04H1-C-15-9934 to A-Secured); AR Tab 14 at 110–43 (IDIQ Award No. AG-04H1-C-15-9935 to Smith Bros.); AR Tab 15 at 144–77 (IDIQ Award No. AG-04H1-C-15-9936 to Connie's).

## IV.  Post-Award Debriefing

On June 17, the day after USFS awarded the contracts, Braseth and Corwin sent identically worded letters to the CO requesting debriefing. See AR Tabs 16–17 at 178–79. Both companies stated that they had "a long history with your agency" and that they had "always performed to the highest standard and with the upmost [sic] speed." Id. Further, both companies represented that they had not "received any written complaints" nor been "contacted with any issues." Id. The companies requested information about "what the evaluation process and standards [we]re and how the awards were determined." Id. Braseth's letter was signed by Cory Braseth, AR Tab 16 at 178, while Corwin's letter was signed by Josh Braseth, AR Tab 17 at 179.

On June 18, the La Grande cache manager, Cheryl Campbell, emailed a document titled "Performance Issues: Connies/Corwin/Braseth INC" to the CO. AR Tab 11 at 66–

66.1. In the document, Ms. Campbell listed several incidents of Connie's subpar performance within the past two years, including late deliveries from the cache, trailers arriving that were not empty or swept clean, late invoicing after services, and, on one occasion, "during Fire Camp unloading, a pallet jack wheel fell through a weak spot in the floor." See id. at 66.1. Ms. Campell also noted that, "[i]n regards to Braseth and Corwin," while "the last contracts that they were awarded [were in] 2009-2010 . . . we had the same problem with the billing invoices in regards to being submitted in a timely manner." Id. In the cover email, Ms. Campbell wrote that she was "[s]orry that this is happening" and that "if push comes to shove, I can deal with him having 2 of the contracts, and will just keep detailed records of every issue that we have with them." Id. at 66.

On June 25, the CO sent debriefing letters to Braseth and Corwin. AR Tabs 18–19 at 180–85. The letters were substantially similar. See id. In each letter, the CO explained that "[t]he Government used a rating matrix that considered Past Performance, Proximity to the Base, and Price," with "past performance . . . considered more important than proximity and when combined . . . approximately of equal importance to price." AR Tab 18 at 180; AR Tab 19 at 183. The letters each included a table showing the past performance and proximity ratings given to the successful offerors as well as the ratings given to the disappointed offeror—i.e., showing that A-Secured and Smith Bros. received ratings of "Excellent" for both past performance and proximity, while Connie's and each disappointed offeror received a "Satisfactory" rating for past performance and an "Excellent" rating for proximity. AR Tab 18 at 180; AR Tab 19 at 183.

The CO then explained that, for both companies, "[y]our past performance was considered satisfactory overall, but several issues were noted during the evaluation including: late arrival at the cache, trailers arriving with pallets/dunnage that had to be sent back, and delays with submitting your invoices." AR Tab 18 at 180; AR Tab 19 at 183.[5] The CO also explained that Braseth's price proposal "ranked 2nd out of 5" and "was only $[. . .], or [. . .]%, less than A-Secured or Smith Bros," AR Tab 18 at 182; and that Corwin's price proposal "ranked 3rd out of 6" and "was only $[. . .], or [. . .]%, less than A-Secured or Smith Bros," AR Tab 19 at 185. Accordingly, because "the government determined it was in its best interests to award to the higher non-price rated companies," it did not award contracts to Braseth or Corwin. AR Tab 18 at 182; AR Tab 19 at 185.

## V.  Agency Protests

On July 3, nine days after the debriefing, Braseth and Corwin filed letters with the CO protesting the award decision. AR Tabs 21–22 at 192–99. The letters disputed both the debriefing's references to the companies' past performance issues and the CO's

---

[5] Unlike the negotiation memorandum, the debriefing letters did not state that Braseth and Corwin were considered "new compan[ies] without a recent record of past performance." See AR Tab 12 at 70, 75.

pricing evaluation. See id. Braseth's letter, which was signed by Lois Braseth, pointed out that when USFS had contracted with Braseth between 2006 and 2011, "[a]ny issues that did arise were resolved in a timely manner and did not reoccur." AR Tab 21 at 192. "If there were complaints," Braseth wondered, "why have we not seen them in the three years since our last contract?" Id. In terms of pricing evaluation, Braseth argued that "[i]n comparing the contract to your debriefing[,] it looks like the rates should only be based on Item 1." Id. Were that the case, Braseth stated, its Item 1 price rating of $[. . .] would be $[. . .] lower than A-Secured's and Smith Bros.' rating of $[. . .], rather than just $[. . .] lower. Id. Braseth requested that the CO provide it with documentation of its past performance issues and re-evaluate the price factor based on its reading of the contract order. Id. at 192–93.

As with Braseth's letter, Corwin's letter (signed by Cory Braseth) questioned both the CO's past performance evaluation and pricing evaluation. AR Tab 22 at 196–97. Corwin claimed that between 2006 and 2011, it "did not receive any written documentation or verbal reprimands to indicate any performance issues," and that "[a]ny time there was any type of situation, it was rectified immediately." Id. at 196. In terms of the price evaluation, Corwin also argued that "[i]n reading the contract order, it looks like only Item 1 should be considered." Id. Corwin stated that it wished to "see all of the past performance evaluations and other documents that were used" in the past performance determination, and that it "would also like an explanation on why none of this was brought to [its] attention before now." Id. at 197.

The CO denied both agency protests as untimely under FAR 33.103(f)(3), which mandates that the disappointed offeror file an agency protest within five days of a debriefing. AR Tabs 23–24 at 200–01. Because the protests were untimely, the CO did not consider the merits of Braseth's and Corwin's claims. See id.

## VI. Proceedings in This Court

Braseth filed its complaint against the United States in this Court on August 6, 2015. No. 15-cv-837, ECF No. 1 ("Braseth Compl."). Corwin filed its complaint the next day. No. 15-cv-844, ECF No. 1 ("Corwin Compl."). The complaints are nearly identical. In them, Braseth and Corwin alleged that the solicitation and award were marred by several deficiencies related to USFS's handling and evaluation of the offerors' past performance information. Braseth Compl. ¶¶ 17–51; Corwin Compl. ¶¶ 18–52. In particular, the companies alleged:

- That USFS relied on incorrect information in assessing the companies' past performance (i.e., by imputing information about Connie's recent past performance to Braseth and Corwin), as the companies had neither recent relevant past performance nor any history of negative past performance, Braseth Compl. ¶¶ 17–22, 29, 32; Corwin Compl. ¶¶ 18–23, 29, 33;

- That USFS improperly failed to consult the government's Past Performance Information Retrieval System (PPIRS) or its Contractor Performance Assessment

Reporting System (CPARS) when evaluating the companies' past performance, Braseth Compl. ¶¶ 30–32; Corwin Compl. ¶ 31–33;

- That USFS's use of an adjectival rating system to evaluate past performance was improper because the solicitation did not specify how past performance would be evaluated, Braseth Compl. ¶¶ 33–35; Corwin Compl. ¶¶ 34–36;

- That USFS improperly failed to give Braseth or Corwin the opportunity to respond to their negative past performance evaluations, Braseth Compl. ¶¶ 36–38, 40, 43; Corwin Compl. ¶¶ 37–39, 41, 45;

- That USFS lacked a sufficient factual basis to assign the companies a past performance rating of "Satisfactory," Braseth Compl. ¶¶ 41–42; Corwin Compl. ¶¶ 42–43; and

- That USFS scored their quotations less favorably than it should have because of the incorrect past performance evaluation, Braseth Compl. ¶¶ 45–49; Corwin Compl. ¶¶ 46–50.

In addition to their allegations of error related to USFS's evaluation of past performance, Braseth and Corwin also alleged that USFS did not evaluate the offerors' prices using the method specified in the solicitation. Braseth Compl. ¶¶ 50–51; Corwin Compl. ¶¶ 51–52. Thus, they contended, USFS's final ranking of the offerors was improper because it relied on both flawed past performance rankings and an improper price evaluation. Braseth Compl. ¶¶ 52–53; Corwin Compl. ¶¶ 53–54.

Finally, the companies alleged that USFS breached the implied duty of good faith and fair dealing by improperly evaluating their past performance and by refusing to acknowledge or respond to their statements regarding that improper evaluation. Braseth Compl. ¶ 54; Corwin Compl. ¶ 55.

The Court consolidated the cases on August 11, 2015. See Order, No. 15-cv-844, ECF No. 7. Following a status conference, the government filed the administrative record on August 13, 2015. No. 15-cv-837, ECF No. 10. On August 31, Braseth and Corwin filed a combined Motion for Judgment on the Administrative Record. ECF No. 14. In it, the companies' pressed their claims regarding USFS's failure to properly evaluate their past performance. However, they made no arguments regarding their claims that USFS improperly evaluated their quoted prices, or that the agency breached the implied duty of good faith and fair dealing.[6] The United States then filed a Motion to Dismiss and Cross-

---

[6] Accordingly, these claims have been waived, and are not discussed further below. See Brooks Range Contract Servs., Inc. v. United States, 101 Fed. Cl. 699, 708 (2012) ("[A] party waives issues not raised in its opening brief.").

Motion for Judgment on the Administrative Record on September 16. ECF No. 15. The
Court held oral argument on the parties' cross motions on November 19, 2015.

## DISCUSSION

## I.  Legal Standards

### A.  Bid Protest Jurisdiction and Standing

The Court of Federal Claims' bid protest jurisdiction is defined by 28 U.S.C.
§ 1491(b)(1), which grants the Court jurisdiction to "render judgment on an action by an
interested party objecting to . . . a proposed award or the award of a contract or any
alleged violation of statute or regulation in connection with a procurement or a proposed
procurement." Thus, only an "interested party" has standing to invoke the Court's bid
protest jurisdiction. CGI Fed. Inc. v. United States, 779 F.3d 1346, 1348 (Fed. Cir. 2015);
Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir.
2002) ("[S]tanding is a threshold jurisdictional issue."). According to the Federal Circuit,
an "interested party" under 28 U.S.C. § 1491(b)(1) is "an actual or prospective bidder . . .
whose direct economic interest would be affected by the award of the contract." CGI
Fed., 779 F.3d at 1348 (quoting Am. Fed'n of Gov't Employees, AFL-CIO v. United
States, 258 F.3d 1294, 1299 (Fed. Cir. 2001); see also Info. Tech. & Applications Corp.
v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In a post-award bid protest, the
protester does not have a "direct economic interest" unless it had a "substantial chance"
of winning the award "but for the alleged error in the procurement process." Tinton Falls
Lodging Realty, LLC v. United States, 800 F.3d 1353, 1358 (Fed. Cir. 2015); see also
Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005). That is to say, the
protestor's chance of securing the award "must not have been insubstantial," Info. Tech.,
316 F.3d at 1319; or, put differently, the protester must have been "prejudiced" by the
alleged error, Tinton Falls, 800 F.3d at 1358.

When determining whether the protester has standing, the Court "must accept the
well-pled allegations of agency error to be true." USfalcon, Inc. v. United States, 92 Fed.
Cl. 436, 450 (2010) (citing Info Tech, 316 F.3d at 1319).[7] And the protester "is not
required to show that but for the alleged error, the protester would have been awarded the
contract." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996) (emphasis
added). Rather, standing exists if there was a "reasonable likelihood that the protester
would have been awarded the contract" but for the alleged error. Id.

---

[7] If standing exists, the question of prejudice may arise again if the court determines on
the merits that the agency has, in fact, erred as alleged. See, e.g., Linc Gov't Servs., LLC
v. United States, 96 Fed. Cl. 672, 695 (2010) (discussing the difference between
"allegational prejudice" for purposes of standing and "APA prejudice" for purposes of
the court's determination on the merits).

**B.   Standard of Review in Bid Protest Cases**

The Court reviews challenges to a contract award under the standards for evaluating agency actions set forth in the Administrative Procedure Act (APA), 5 U.S.C. § 706. See 28 U.S.C. § 1491(b)(4). Accordingly, to successfully challenge an agency's procurement decision, a plaintiff must show that the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see also Bannum, Inc., 404 F.3d at 1351. To meet this standard in a bid protest, the protester must demonstrate either that "the procurement official's decision lacked a rational basis" or that "the procurement procedure involved a violation of regulation or procedure." Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

This standard is "highly deferential," Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and the protester "bears a heavy burden" in attempting to challenge the procuring agency's decision, Impresa Construzioni, 238 F.3d at 1338. Moreover, "[t]he protestor's burden is greater in [a] negotiated procurement, as here, than in other types of bid protests because 'the contracting officer is entrusted with a relatively high degree of discretion.'" Glenn Defense Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013) (quoting Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004)).

Accordingly, the court must determine only "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni, 238 F.3d at 1332–33 (quoting Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)). Even if the agency's explanation is "of less than ideal clarity," the court will uphold the decision if "the agency's path may reasonably be discerned." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (quoting Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 286 (1974)).

**C.   Standard for Judgment on the Administrative Record**

Pursuant to Rules of the Court of Federal Claims 52.1, the Court reviews an agency's procurement decision based on the administrative record. Bannum, Inc., 404 F.3d at 1354. The Court makes "factual findings . . . from the record evidence as if it were conducting a trial on the record." Id. at 1357. Thus, "resolution of a motion respecting the administrative record is akin to an expedited trial on the paper record, and the Court must make fact findings where necessary." Baird v. United States, 77 Fed. Cl. 114, 116 (2007). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A&D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006). Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. Bannum, Inc., 404 F.3d at 1356.

## II. Application of Standards

### A. Standing

The Court concludes that Braseth has standing to protest USFS's decision, but that Corwin does not. As described above, to determine standing, the Court must accept as true the alleged errors in the procurement process—here, that the CO's decision was internally inconsistent and, to the extent the CO imputed Connie's past performance issues to Braseth and Corwin, that his decision to do so was improper. See Pls.' Mot. for J. on the Admin. R. (Pls.' Mot.) at 10–11, 18–19, ECF No. 14; Pls.' Resp. To Def.'s Cross-Mot. for J. on the Admin. R. at 7–8, ECF No. 16-1. Because of these errors, Braseth and Corwin contend, the CO treated their quotations as differing from Connie's only in price. Pls.' Mot. at 11.

As the CO acknowledged, neither Braseth nor Corwin had relevant past performance of their own within three years of the contract award. AR Tab 12 at 70; see also Def.'s Mot at 20 (conceding that neither company had "relevant and recent past performance information with the Forest Service"). And under FAR 15.305(a)(2)(iv), "[i]n the case of an offeror without a record of relevant past performance . . . the offeror may not be evaluated favorably or unfavorably on past performance." Thus, accepting as true Braseth and Corwin's allegations of error, the CO should have treated Braseth and Corwin's quotations as differing from Connie's in both price and past performance—that is, in addition to comparing prices, he should have assessed whether the risks associated with dealing with an entity with no performance record at all (Braseth or Corwin) outweighed the benefits of choosing one that could be rated "satisfactory" but still had known weaknesses (Connie's). See Metcalf Const. Co. v. United States, 53 Fed. Cl. 617, 641 (2002) ("Once all the bidders have the same adjectival rating, in order to reasonably and rationally rank them, the [CO] must go beneath those ratings to show specifically where it finds advantages in one . . . offer over another . . . offer, notwithstanding the sameness of the ratings."); John Cibinic, Jr. et al., Formation of Gov't Contracts 856–58 (4th ed. 2011) (discussing evaluation of offerors with no relevant past performance). The Court concludes that, had he done so, Braseth's chances of being selected over Connie's were not "insubstantial."[8]

The government's argument to the contrary—that Braseth and Corwin had no substantial chance because they would have received the same "satisfactory" rating even

---

[8] Even accepting Braseth's and Corwin's allegations as true, the Court concludes that neither company had a substantial chance of receiving the awards given to A-Secured and Smith Bros., which both received past performance ratings of "Excellent." See AR Tab 12 at 69. As mentioned above, the CO described the variance in pricing among all the quotations as "very tight," id. at 74, and nothing in the record leads the Court to believe, given the tight variance, that there was a substantial chance that the CO might have chosen a company with no relevant past performance over a company with an excellent past performance rating.

if the CO had not imputed Connie's past performance to them—is unavailing, for "proposals awarded the same adjectival ratings are not necessarily equal in quality." Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 514 (2009). Indeed, adjectival ratings are simply "useful as guides to decision-making" and are not intended to be outcome-determinative. See Redstone Tech. Servs., B-259222, 1995 WL 153633, at *6 (Comp. Gen. Mar. 17, 1995) (rejecting a CO's "mechanical" application of adjectival ratings). Thus, even if "satisfactory" was the only available adjectival rating to describe "neutral" past performance, the CO could properly "look beneath" the rating to understand why the offeror was given the rating and, more importantly, to assess how those reasons might affect the offeror's performance of the contract. Metcalf Const., 53 Fed. Cl. at 640–41; see also Blackwater Lodge, 86 Fed. Cl. at 514. Thus, Braseth or Corwin might still have had a "substantial chance" of securing the award even though they had the same adjectival past performance rating as Connie's.

Corwin, however, faces an additional hurdle: as the Federal Circuit has made clear, if "bids materially differ only as to price . . . only the second-lowest bidder has a direct economic interest in the award of the contract." United States v. Int'l Bus. Machines Corp., 892 F.2d 1006, 1011(Fed. Cir. 1989). Even accepting Braseth and Corwin's allegations of error as true, Corwin's quote was equivalent to Braseth's in terms of past performance, and its quoted prices were higher. See AR Tab 12 at 72. Therefore, Corwin has no direct economic interest at stake, for both Braseth and Corwin could only compete for the award that eventually went to Connie's. Corwin thus does not have standing to protest the award, and the Court lacks jurisdiction over its claims. Accordingly, Corwin's complaint must be dismissed.

## B. The Merits of Braseth's Bid Protest

Based on its review of the administrative record, the Court concludes that it is not possible to determine whether the CO's decision to make an award to Connie's rather than Braseth represented a reasonable exercise of his discretion. Most notably, the CO did not supply a consistent rationale regarding how Braseth's past performance (or lack thereof) affected his decision.

Thus, as recounted above, at one point in the negotiation memorandum the CO stated that Braseth "lacked recent past performance with the agency," noting too that, under FAR 15.305(a)(2)(iv), "an offeror without a record of relevant past performance . . . may not be evaluated favorably or unfavorably on past performance." AR Tab 12 at 70. Yet later in the memorandum, when conducting the trade-off analysis required by FAR 15.308, the CO stated both that Braseth was "considered a new company without a recent record of past performance" and that there were "[i]dentical concerns as Connie's"—i.e., concerns about past performance. Id. at 75.

These contradictory statements within the award decision itself simply cannot be reconciled. It is not logically possible to treat Braseth in a neutral fashion, as a new company without a record of past performance, and also to impute to it concerns about Connie's past performance.

Further, the remaining documents in the administrative record only deepen the confusion. For instance, the "performance document" written by the cache manager mainly describes issues with Connie's past performance; but the document's cover email also states that she "can deal with him having 2 of the contracts," indicating that the concerns about Connie's past performance apply equally to Braseth. AR Tab 11 at 66–66.1 (emphasis added). And in Braseth's debriefing letter, the CO clearly ascribes Connie's past performance to Braseth (albeit without explicitly stating that he was doing so), asserting that "[y]our past performance was considered satisfactory overall, but several issues were noted during the evaluation including: late arrival at the cache, trailers arriving with pallets/dunnage that had to be sent back, and delays with submitting your invoices." AR Tab 18 at 180. This statement (which the Court observes is a post hoc explanation of the decision to select Connie's and therefore entitled to less weight) appears to flatly contradict the portion of the negotiation memorandum stating that Braseth would not be evaluated favorably or unfavorably based on its past performance because it "lacked recent past performance with the agency." See AR Tab 12 at 70.

Beyond this internal incoherence, it is clear to the Court that, to the extent that the CO intended to treat Braseth as "an offeror without a record of relevant past performance [who] may not be evaluated favorably or unfavorably on past performance," ascribing Connie's past performance "issues" to Braseth (as the debriefing memorandum clearly did) would have been arbitrary and capricious. There is simply no rational way to frame the attribution of performance weaknesses to Braseth as anything other than a relatively "unfavorable" evaluation of its performance, even if the adjectival rating it was ultimately assigned for past performance was "satisfactory." The government's contrary argument—that such an evaluation was not "unfavorable" in this case because it resulted in a "satisfactory" rating, which was considered "neutral"—is circular and unconvincing. See Def.'s Mot. at 30–31; Def.'s Reply in Supp. of its Mot. to Dismiss and Cross-Mot. for J. upon the Admin. R. at 14, ECF No. 19. As discussed above, adjectival ratings serve as a means to an end, not an end in and of themselves. See Metcalf Const., 53 Fed. Cl. at 640–41. If the CO in this case did in fact ascribe Connie's performance weaknesses to Braseth, then he did not treat Braseth in a neutral fashion (i.e., as though it had no past performance history at all), even if he gave both Connie's and Braseth the same adjectival rating.[9]

---

[9] In that regard, the record does not support the government's argument that the CO based Braseth's satisfactory rating on "alternative bas[es]": one grounded in the attribution of Connie's performance to Braseth and another under which Braseth received a truly "neutral" evaluation based on its lack of any relevant performance history. See Pls.' Mot. at 13–14. Thus, if the contracting officer intended to rely on alternative grounds, he would have conducted two different trade-off analyses. The first analysis would have been one which treated Connie's and Braseth as completely indistinguishable in terms of their past performance, and which would have awarded the contract to Connie's because of its lower price. The second analysis would have compared the pluses and minuses of choosing a competitor with some demonstrated performance weaknesses and a lower price (Connie's) to the pluses and minuses of choosing a competitor with a slightly higher

To be clear, the Court is not suggesting that the CO would have been <u>required</u> to select Braseth over Connie's if he compared the former's lack of a performance history against Connie's identified weaknesses. For example, the CO might reasonably have decided that Connie's identified weaknesses were not significant enough to justify paying the slightly higher price quoted by Braseth. Or, he might have determined that it would be best to go with a known entity, rather than one with no relevant performance history. But either way, the CO must provide an explanation for his exercise of discretion that is coherent and not internally inconsistent so that the Court has a basis for reviewing its reasonableness.

Finally, because the actual basis for the CO's decision is not discernible from the administrative record, the Court does not at this time address Braseth's argument that the contracting officer's decision was arbitrary, capricious, or contrary to law because it imputed Connie's past performance to Braseth (rather than treating Braseth as having no relevant past performance).[10] Similarly, because the administrative record does not make it clear whether or not the CO intended to treat Braseth as an entity with no past performance history, the Court does not at this time address Braseth's arguments that USFS was required to consult PPIRS or CPARS when evaluating its past performance or that it violated the FAR by failing to give Braseth the opportunity to respond to its negative past performance evaluations.

In summary: the CO's explanation for choosing Connie's over Braseth lacks sufficient clarity to permit this Court to exercise its review function. Accordingly, the Court will remand the matter back to the agency for it to provide a coherent explanation for its decision consistent with the concerns expressed in this opinion. <u>See</u> <u>PlanetSpace, Inc. v. United States</u>, 92 Fed. Cl. 520, 549 (2010) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional

---

price and without any performance history, positive or negative (Braseth). Nor may the Court fill the gap left by the CO and thereby determine that the CO made "alternative" choices. <u>See</u> <u>Bowman</u>, 419 U.S. at 285–86 (1974) (holding that a court "may not supply a reasoned basis for the agency's action that the agency itself has not given"); <u>OMV Med., Inc. v. United States</u>, 219 F.3d 1337, 1344 (Fed. Cir. 2000) (applying the <u>Bowman</u> rule in a bid protest).

[10] The Court notes, however, that FAR 15.305(a)(2)(ii) permits the government to "evaluat[e] the offeror['s] past performance" based on information obtained not only from the offeror, but also from "any other sources" at its disposal; and it expressly commits the determination of "the relevance of similar past performance information" to the CO. Moreover, the regulations state that the CO "should take into account" past performance information regarding "predecessor companies, key personnel who have relevant experience, or subcontractors that will perform major or critical aspects of the requirement" as long as that information "is relevant to the instant acquisition." FAR 15.305(a)(2)(iii).

investigation or explanation." (quoting <u>Florida Power & Light Co. v. Lorion</u>, 470 U.S. 729, 744 (1985))). The Court will further stay resolution of the parties' cross-motions for judgment on the administrative record, pending receipt of such explanation.

## CONCLUSION

For the reasons stated above, the Defendant's motion to dismiss is **GRANTED** as to Corwin but **DENIED** as to Braseth. Accordingly, Corwin's complaint is hereby **DISMISSED** without prejudice.

Further, because the Court cannot determine the basis (or bases) on which the CO assigned Braseth a "satisfactory" past performance rating or the rationale for his trade-off analysis, the Court **REMANDS** this matter to USFS to explain, consistent with this opinion, the basis for its evaluation of Braseth's offer and its decision to select Connie's rather than Braseth. USFS shall provide the Court with a coherent explanation of the reasons behind its determination by **January 8, 2016**. Once USFS has filed its explanation, the parties shall—within seven days thereafter—file a joint proposal to govern proceedings going forward, including, as appropriate, a proposed schedule for supplemental briefing. The parties' cross-motions for judgment on the administrative record are hereby **STAYED** for the duration of the remand.

**IT IS SO ORDERED.**

 /s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge